AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means      ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the

Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.    2:21-MJ-03910 |
| vehicle registered to COLBURT, a 2016 Dodge Challenger with a personalized California license plates "CAPTACS" | ) ) ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

     An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

    *See Attachment A*

     I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

    *See Attachment B*

     Such affidavit(s) or testimony are incorporated herein by reference.

     **YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

     Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

     The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

     ☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     <u>8/20/2021, 10:47 am</u>      <u>    *(signature)*    </u>

                                                      *Judge's signature*

City and state:     <u>Los Angeles, CA</u>         Honorable Pedro V. Castillo

                                                        *Printed name and title*

AUSA: <u>Chelsea Norell x2624</u>

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>21-MJ-3910 | Date and time warrant executed:<br>08/26/2021 6:10AM | Copy of warrant and inventory left with:<br>Brian Colburt |
| Inventory made in the presence of :<br>n/a | | |
| Inventory of the property taken and name of any person(s) seized: | | |

No items were seized.

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____09/20/21_____

_____
Executing officer's signature

Timothy Alon/Special Agent
_____
Printed name and title

## ATTACHMENT A-3

**VEHICLE TO BE SEARCHED**

The vehicle to be searched is a 2016 Dodge Challenger with California license plate "CAPTACS."

**ATTACHMENT B**

**I.   ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography) (the "Subject Offenses"), namely:

a.   Child pornography, as defined in 18 U.S.C. § 2256(8).

b.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer to child pornography, as defined in 18 U.S.C. § 2256(8), including but not limited to documents that refer to the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography.

c.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, and also including but not limited to financial records, tending to identify persons involved in the possession, receipt, distribution, transmission, reproduction, viewing, sharing, purchase, or downloading, production, shipment, order, requesting, trade, or transaction of any kind, involving child pornography, as defined in 18 U.S.C. § 2256.

       d.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that refer or relate to any production, receipt, shipment, order, request, trade, purchase, or transaction of any kind involving the transmission through interstate commerce by any means, including by computer, of any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

       e.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, identifying persons transmitting in interstate commerce, including by computer, any visual depiction of a minor engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

       f.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, that identify any minor visually depicted while engaging in sexually explicit conduct, as defined in 18 U.S.C. § 2256.

       g.   Any and all records, documents, programs, applications, or materials or items which are sexually arousing to individuals who are interested in minors, but which are not in and of themselves obscene or which do not necessarily depict minors involved in sexually explicit conduct. Such material is commonly known as "child erotica" and includes written materials dealing with child development, sex education, child pornography, sexual abuse of children, incest, child prostitution, missing children, investigative techniques of

child exploitation, sexual disorders, pedophilia, nudist publications, diaries, and fantasy writings.

     h.   Any records, documents, programs, applications, or materials identifying possible minor victims depicted in child pornography and/or minor victims of sexual abuse.

     i.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to peer-to-peer file sharing software, such as eD2K.

     j.   Any records, documents, programs, applications, or materials, including electronic mail and electronic messages, which pertain to accounts with any Internet Service Provider.

     k.   Any records, documents, programs, applications, materials, and files relating to IP address 104.172.216.204.

     l.   Records, documents, programs, applications, materials, and files relating to the deletion, uploading, and/or acquisition of victim files to include photographs, videos, e-mails, chat logs, or other files.

     m.   Any digital device used to facilitate the above-listed violations and forensic copies thereof.

     n.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

     o.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

       i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

       ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

       iii. evidence of the attachment of other devices;

       iv.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

       v.   evidence of the times the device was used;

       vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

       vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

       viii.    records of or information about Internet Protocol addresses used by the device;

       ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser

history and cookies, "bookmarked" or "favorite" web pages,
search terms that the user entered into any Internet search
engine, and records of user-typed web addresses.

    2.    As used herein, the terms "records," "documents,"
"programs," "applications," and "materials" include records,
documents, programs, applications, and materials created,
modified, or stored in any form, including in digital form on
any digital device and any forensic copies thereof.

    3.    As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony
PlayStations and Microsoft Xboxes); peripheral input/output
devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

## II.  SEARCH PROCEDURE FOR DIGITAL DEVICES

    4.    In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.     The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool

Kit), which tools may use hashing and other sophisticated techniques, including to search for known images of child pornography.

c. If the search team, while searching a digital device, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that device pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

d. If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e. If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f. If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

        f.    Any physical keys, encryption devices, dongles,
or similar physical items that are necessary to gain access to
the digital device or data stored on the digital device; and

        g.    Any passwords, password files, biometric keys,
test keys, encryption codes, or other information necessary to
access the digital device or data stored on the digital device.

        h.    After the completion of the search of the digital
devices, the government shall not access digital data falling
outside the scope of the items to be seized absent further order
of the Court.

    6.    During the execution of this search warrant, law
enforcement is permitted to: (1) depress COLBURT's thumb and/or
fingers onto the fingerprint sensor of the device (only when the
device has such a sensor), and direct which specific finger(s)
and/or thumb(s) shall be depressed; and (2) hold the device in
front of COLBURT's face with his or her eyes open to activate
the facial-, iris-, or retina-recognition feature, in order to
gain access to the contents of any such device.  In depressing a
person's thumb or finger onto a device and in holding a device
in front of a person's face, law enforcement may not use
excessive force, as defined in Graham v. Connor, 490 U.S. 386
(1989); specifically, law enforcement may use no more than
objectively reasonable force in light of the facts and
circumstances confronting them.

    7.    The special procedures relating to digital devices
found in this warrant govern only the search of digital devices
pursuant to the authority conferred by this warrant and do not

apply to any search of digital devices pursuant to any other

court order.

**AFFIDAVIT**

I, Timothy Alon, being duly sworn, declare and state as follows:

**I. PURPOSE OF AFFIDAVIT**

1.    This affidavit is made in support of an application for a warrant to search the following:

a.    Premises located at 1440 Brett Place, Unit 64, San Pedro, California (the "SUBJECT PREMISES"), as described further in Attachment A-1, which is attached hereto and incorporated herein by reference;

b.    The person of BRIAN SCOTT COLBURT ("COLBURT"), as described further in Attachment A-2, which is attached hereto and incorporated herein by reference; and

c.    The vehicle registered to COLBURT, a 2016 Dodge Challenger with a personalized California license plates "CAPTACS" ("SUBJECT VEHICLE"), as described further in Attachment A-3, which is attached hereto and incorporated herein by reference.

2.    As described further in Attachment B, the requested warrants seek authorization to seize evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography) (the "Subject Offenses").

3.    The statements contained in this affidavit are based
in part on information provided by U.S. federal law enforcement
agents; written reports about this and other investigations that
I have received, directly or indirectly, from other law
enforcement agents, information gathered from the service of
administrative subpoenas; the results of physical surveillance
conducted by law enforcement agents; independent investigation
and analysis by law enforcement agents/analysts and computer
forensic professionals; and my experience, training and
background as a Special Agent.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

## II.    BACKGROUND OF SPECIAL AGENT TIMOTHY ALON

5.    I am a Special Agent ("SA") with the Federal Bureau of
Investigation ("FBI") and have been so employed since 1995.  My
responsibilities with the FBI include investigations into the
sexual exploitation of children and child pornography in the
Central District of California.  The FBI is responsible for

enforcing federal criminal statutes involving the sexual exploitation of children under 18 U.S.C. § 2251 et seq. During my tenure with the FBI, I have conducted and participated in numerous investigations of criminal activity, including at least 300 investigations in which targets have exploited children, typically by transmitting child pornography using computers connected to the Internet. During my investigations in these cases, I have participated in the execution of at least 300 search warrants in which evidence of these violations was seized. I am currently assigned to the Child Exploitation Investigations Group ("CEIG"), which is a task force specifically dedicated to investigating and combating child exploitation. The CEIG task force is operated by the Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations.

6. Through my training and my experience, I have become familiar with the methods of operation used by people who commit offenses involving the sexual exploitation of children. I have attended training classes concerning computer crimes and the sexual exploitation of children on the Internet. This training has given me an understanding of how people involved with offenses relating to the sexual exploitation of children use the Internet to further those offenses. My experience in investigations in this regard has supplemented my understanding of how people involved in offenses related to the sexual exploitation of children use the Internet to further those offenses.

### III. <u>BACKGROUND REGARDING CHILD EXPLOITATION OFFENSES,</u>
### <u>COMPUTERS, THE INTERNET, AND DEFINITION OF TERMS</u>

7.    In this affidavit, the terms "minor," "sexually explicit conduct," "visual depiction," "producing," and "child pornography" are defined as set forth in 18 U.S.C. § 2256.  The term "computer" is defined as set forth in 18 U.S.C. § 1030(e)(1).

8.    Based upon my training and experience in the investigation of child pornography, and information related to me by other law enforcement officers involved in the investigation of child pornography, I know the following information about the use of computers with child pornography:

a.    <u>Computers and Child Pornography</u>.  Computers and computer technology have revolutionized the way in which child pornography is produced, distributed, and utilized.  Child pornographers can now produce both still and moving images directly from a common video camera and can convert these images into computer-readable formats.  The use of digital technology has enabled child pornographers to electronically receive, distribute, and possess large numbers of child exploitation images and videos with other Internet users worldwide.

b.    <u>File Storage</u>.  Computer users can choose their method of storing files: either on a computer's hard drive, an external hard drive, a memory card, a USB thumb drive, a smartphone or other digital media device, etc. (<u>i.e.</u>, "locally") or on virtual servers accessible from any digital device with an Internet connection (<u>i.e.</u>, "cloud storage").  Computer users

4

frequently transfer files from one location to another, such as from a phone to a computer or from cloud storage to an external hard drive. Computer users also often create "backup," or duplicate, copies of their files. In this way, digital child pornography is extremely mobile and such digital files are easily reproduced and transported. For example, with the click of a button, images and videos containing child pornography can be put onto external hard drives small enough to fit onto a keychain. Just as easily, these files can be copied onto compact disks and/or stored on mobile digital devices, such as smart phones and tablets. Furthermore, even if the actual child pornography files are stored on a "cloud," files stored in this manner can only be accessed via a digital device. Therefore, viewing this child pornography would require a computer, smartphone, tablet, or some other digital device that allows the user to access and view files on the Internet.

        c.   <u>Internet</u>. The term "Internet" is defined as the worldwide network of computers -- a noncommercial, self-governing network devoted mostly to communication and research with roughly 500 million users worldwide. The Internet is not an online service and has no real central hub. It is a collection of tens of thousands of computer networks, online services, and single user components. In order to access the Internet, an individual computer user must use an access provider, such as a university, employer, or commercial Internet Service Provider ("ISP"), which operates a host computer with direct access to the Internet.

      d.   <u>Internet Service Providers</u>.  Individuals and
businesses obtain access to the Internet through ISPs.  ISPs
provide their customers with access to the Internet using
telephone or other telecommunications lines; provide Internet e-
mail accounts that allow users to communicate with other
Internet users by sending and receiving electronic messages
through the ISPs' servers; remotely store electronic files on
their customer's behalf; and may provide other services unique
to each particular ISP.  ISPs maintain records pertaining to the
individuals or businesses that have subscriber accounts with
them.  Those records often include identifying and billing
information, account access information in the form of log
files, e-mail transaction information, posting information,
account application information, and other information both in
computer data and written record format.

      e.   <u>IP Addresses</u>.  An Internet Protocol address ("IP
Address") is a unique numeric address used to connect to the
Internet.  An IPv4 IP Address is a series of four numbers, each
in the range 0-255, separated by periods (<u>e.g.</u>, 121.56.97.178).
In simple terms, one computer in a home may connect directly to
the Internet with an IP Address assigned by an ISP.  What is now
more typical is that one home may connect to the Internet using
multiple digital devices simultaneously, including laptops,
tablets, smart phones, smart televisions, and gaming systems, by
way of example.  Because the home subscriber typically only has
one Internet connection and is only assigned one IP Address at a

time by their ISP, multiple devices in a home are connected to
the Internet via a router or hub.  Internet activity from every
device attached to the router or hub is utilizing the same
external IP Address assigned by the ISP.  The router or hub
"routes" Internet traffic so that it reaches the proper device.
Most ISPs control a range of IP Addresses.  The IP Address for a
user may be relatively static, meaning it is assigned to the
same subscriber for long periods of time, or dynamic, meaning
that the IP Address is only assigned for the duration of that
online session.  Most ISPs maintain records of which subscriber
was assigned which IP Address during an online session.

     f.    The following definitions:

        i.    "Chat," as used herein, refers to any kind
of text communication over the Internet that is transmitted in
real-time from sender to receiver.  Chat messages are generally
short in order to enable other participants to respond quickly
and in a format that resembles an oral conversation.  This
feature distinguishes chatting from other text-based online
communications such as Internet forums and email.

        ii.   "Chat room," as used herein, refers to the
ability of individuals to meet in one location on the Internet
in order to communicate electronically in real-time to other
individuals.  Individuals may also have the ability to transmit
links to electronic files to other individuals within the chat
room.

7

iii. "Child erotica," as used herein, means materials or items that are sexually arousing to persons having a sexual interest in minors but that are not necessarily obscene or do not necessarily depict minors engaging in sexually explicit conduct.

iv. "Child pornography," as defined in 18 U.S.C. § 2256(8), is any visual depiction, including any photograph, film, video, picture, or computer or computer-generated image or picture, whether made or produced by electronic, mechanical or other means, of sexually explicit conduct, where: (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

v. "Cloud-based storage," as used herein, is a form of digital data storage in which the digital data is stored on remote servers hosted by a third party (as opposed to, for example, on a user's computer or other local storage device) and is made available to users over a network, typically the Internet. Users of such a service can share links and associated passwords to their stored files with other traders of child pornography in order to grant access to their collections. Such services allow individuals to easily access these files through a wide variety of electronic devices such as desktop and

8

laptop computers, mobile phones, and tablets, anywhere and at any time. An individual with the password to a file stored on a cloud-based service does not need to be a user of the service to access the file. Access is typically free and readily available to anyone who has an Internet connection.

vi. "Computer," as used herein, refers to "an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device" and includes smartphones, other mobile phones, and other mobile devices. See 18 U.S.C. § 1030(e)(1).

vii. "Computer hardware," as used herein, consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, "thumb," "jump," or "flash" drives, which are small devices that are plugged into a port on the computer, and other memory storage devices); peripheral input/output devices (including keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts that can be used to

restrict access to computer hardware (including physical keys and locks).

   viii. "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

   ix. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

   x. "File Transfer Protocol" ("FTP"), as used herein, is a standard network protocol used to transfer computer files from one host to another over a computer network, such as the Internet. FTP is built on client-server architecture and

uses separate control and data connections between the client and the server.

xi. "Encryption" is the process of converting data into a code in order to prevent unauthorized access to the data.

xii. "Log files" are records automatically produced by computer programs to document electronic events that occur on computers. Computer programs can record a wide range of events including remote access, file transfers, logon/logoff times, and system errors. Logs are often named based on the types of information they contain. For example, web logs contain specific information about when a website was accessed by remote computers; access logs list specific information about when a computer was accessed from a remote location; and file transfer logs list detailed information concerning files that are remotely transferred.

xiii. "Minor," as defined in 18 U.S.C. § 2256(1), refers to any person under the age of eighteen years.

xiv. "Mobile applications," as used herein, are small, specialized programs downloaded onto mobile devices that enable users to perform a variety of functions, including engaging in online chat, reading a book, or playing a.

xv. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

xvi. "Remote computing service," as defined in 18 U.S.C. § 2711(2), is the provision to the public of computer storage or processing services by means of an electronic communications system.

xvii.     "Sexually explicit conduct," as defined in 18 U.S.C. § 2256(2), means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the anus, genitals, or pubic area of any person.

xviii.    A "storage medium" or "storage device" is any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, "thumb," "jump," or "flash" drives, CD-ROMs, and other magnetic or optical media.

xix. "Visual depiction," as defined in 18 U.S.C. § 2256(5), includes undeveloped film and videotape, data stored on computer disc or other electronic means which is capable of conversion into a visual image, and data which is capable of conversion into a visual image that has been transmitted by any means, whether or not stored in a permanent format.

xx. A "Website" consists of textual pages of information and associated graphic images.  The textual information is stored in a specific format known as Hyper-Text Mark-up Language (HTML) and is transmitted from web servers to various web clients via Hyper-Text Transport Protocol (HTTP).

## IV.  BACKGROUND OF PEER-TO-PEER NETWORKS

9.    Peer-to-Peer (hereinafter "P2P") are file sharing programs designed for the purposes of sharing and distributing files.   P2P file sharing is a method of communication available to Internet users through the use of software programs or clients.   P2P file sharing programs allow groups of computers using the same file sharing network and protocols to transfer digital files from one computer system or digital device to another while connected to a network, usually on the Internet. There are multiple types of P2P file sharing networks on the Internet.   To connect to a particular P2P file sharing network, a user first chooses to download a P2P client software program for a particular P2P file sharing network, which can be downloaded from the Internet.

10.   A particular P2P file sharing network may have many different P2P client software programs that allow access to that particular P2P file sharing network or multiple P2P file sharing networks.   These P2P client software programs share common protocols for network access and file sharing.   P2P client software allows the user to set up file(s) on a computer to be shared on a P2P file sharing network with other users on the network.   A user can also obtain files by opening the P2P client software on the user's computer and conducting a search for files that are of interest and currently being shared on a P2P file sharing network.   For example, one commonly used P2P client program is Shareaza.   Shareaza is a free publicly available P2P software program that supports multiple P2P file sharing

networks, including Gnutella, BitTorrent, and eDonkey2000
(eD2K).

11.   Peers can be identified on P2P networks by their
Globally Unique Identifier ("GUID") also known as a user's hash.[1]
Each client randomly generates a 16-byte alphanumeric value to
uniquely identify itself on the P2P network.  This unique
alphanumeric value could be compared to a serial number.  A
purpose of the GUID is to uniquely identify the user compared to
other peers in order to receive credit for sharing files with
users on the network.  Generally, the GUID will identify the
same peer/user despite IP address changes, although the GUID can
be regenerated by the user. Based on my training and experience,
I know the probability of a randomly generated GUID matching
another GUID is extremely low.

12.   One method for an investigator to search a P2P network
for users possessing and/or disseminating child pornography
files is to type in search terms, based on their training and
experience, that would return file name results indicative of
child pornography.  The investigator would then download the
file and determine if it indeed contained child pornography.  If

---

[1] A hash value is a unique numerical value assigned to
files.  Hash values are the equivalent of DNA for a file.  There
are several types of algorithms that can be applied, such as the
Message Digest (MD) and Secure Hash Algorithm 1 (SHA-1) families
of hashing algorithms.  Hash values are a very reliable method
of authenticating files.  It can be concluded with a great
degree of certainty that two files which share the same hash
value, also share identical content. Based on my training and
experience, I know that it is more likely two individuals would
share the same DNA than for two files to share the same hash
value. Hash values will change if a file is altered in any way.

so, the investigator can document the hash value of this file, to be compared with future identical files observed on the network.  Although transparent to the typical user, when searches are conducted, additional results are received from the servers or other clients, which may include a hash value of the file, the file size, and the IP addresses of clients who recently reported to the network as having that file in whole or in part.  This information can be documented by investigators and compared to those hash values the investigator has obtained in the past and believes to be child pornography.  This allows for the detection and investigation of computers involved in possessing, receiving, and/or distributing files of previously identified child pornography.  Therefore, without even downloading the file, the investigator can compare the hash value and determine with mathematical certainty that a file seen on the network is an identical copy of a child pornography file previously identified as child pornography by law enforcement.

13.  Additionally, another investigative method allows investigators the ability, while adhering to the network protocols, to search for files they believe to be child pornography, using known hash values of files previously identified as child pornography.  During this type of search, the investigator can query the network servers for client users who have recently reported to the network servers that they have a file, in whole or in part, that matches a known hash value of a file previously identified as child pornography.  The network

15

servers will respond with matching results, which include the clients' IP address(es).

14.   The ability to identify the approximate location of these IP addresses is provided by IP geographic mapping services, which are publicly available and also used for marketing and fraud detection.  At this point in the investigative process, an association between a known file (based upon on the hash value comparison) and a computer having a specific IP address (likely to be located within a specific region) can be established.

15.   Once a client user is identified as recently having a file believed to be child pornography, in whole or in part, the investigator can then query that client user directly to confirm the client user has that file, in whole or in part, and/or download that file directly from the client user exclusively, otherwise known as a single source download.  Depending upon several factors, including configuration and available resources, it might not be possible to do either.  The process of sharing files on P2P networks involves clients allowing other clients to copy a file or portions of a file.  This sharing process does not remove the file from the computer sharing the file.  This process places a copy of the file on the computer which downloaded it.

16.   During the query and/or downloading process from a remote client, certain information is exchanged between the investigator's client and the remote client they are querying and/or downloading a file from.  Such as (1) the remote client's

IP address; (2) if the remote client has the file in whole or only in part; (3) the file name on the remote client's computer; (4) the hash value of the file; (5) the remote client's GUID; (6) the remote client's software and version; (7) and the investigator's user hash. This information may remain on the remote client's computer system for long periods of time. The investigator has the ability to log this information. A search can later be conducted on a seized computer system(s) for this information, which may provide further evidence that the investigator's client communicated with the remote client.

## V. **SUMMARY OF PROBABLE CAUSE**

17. On or about May 11, 2021, I accessed the Child Protection System ("CPS"), a web-based interface for identifying users that are utilizing P2P networks to trade child pornography, and obtained a network activity report[2] for IP address 104.172.216.204 (the "SUBJECT IP ADDRESS"). The SUBJECT IP ADDRESS was recorded by CPS making available approximately 276 child sexual abuse material ("CSAM") files on the eDonkey P2P network. I reviewed the network activity report and observed many file names containing words indicative of child pornography. The network activity report also listed the hash value of each of the files listed.

---

[2] A network activity report provides, in the form of a spreadsheet, the following information, including but not limited to, the exact IP address, port, timestamp (date and time in GMT), hash value, GUID, and file name of each file captured as contained on the device utilizing the IP address.

18.  On or about June 14, 2021, I accessed a child pornography database ("CP Database") in the custody of HSI.  The CP Database contains over 375,000 suspected child pornography files.  Utilizing the hash values listed on the network activity report, I found approximately nine CSAM files having the same hash values in the CP Database.  I reviewed the nine CSAM files and confirmed their content contained CSAM.

19.  As it relates to the requested warrant, I believe the digital device(s) which facilitated the distribution of files containing child sexual abuse material are located at the SUBJECT PREMISES because, among other things, information obtained from Charter Communications showed that the aforementioned IP address is registered to the SUBJECT PREMISES.

### VI.  STATEMENT OF PROBABLE CAUSE
**A. A user on the P2P network eDonkey uses the IP address registered to SUBJECT PREMISES to share child pornography**

20.  On or about May 11, 2021, I accessed the Child Protection System ("CPS"), which is a web-based interface for identifying individuals that are utilizing P2P networks to trade child pornography.  On the website, I queried for IP addresses with the most observed CSAM files being traded.  One of the IP addresses I observed was IP address 104.172.216.204 (the "SUBJECT IP ADDRESS").  The SUBJECT IP ADDRESS was observed by CPS making available approximately 276 CSAM files on the eDonkey P2P network.

21.  I obtained and reviewed a network activity report of the SUBJECT IP ADDRESS, which contained every file's hash value

available from the SUBJECT IP ADDRESS.  From this report, I saw
that approximately 276 of the files possessed by the user
("SUBJECT ACCOUNT") had previously been matched by various law
enforcement officers via hash value to files that law
enforcement had indicated contained CSAM.  In most cases
involving CSAM, the images/videos are catalogued throughout
various databases.  The files associated with the SUBJECT IP
ADDRESS had been previously viewed by law enforcement officers
and, although the victims' exact identities were not divulged,
were catalogued to contain CSAM.

22.  The names of the files offered by the SUBJECT ACCOUNT
contained words such as "PTHC," "Preteen," and "pedo" – terms
that I know through my training and experience are often used to
denote depictions of CSAM.  (For example, "pthc" stands for
"pre-teen hardcore" and "pedo" is a slang term for a person with
a sexual interest in children/minors.)

23.  The network activity report also included the GUIDs
(the unique user identifiers, defined above at paragraph 11),
operating on the SUBJECT IP ADDRESS.  The most recent GUID was
3B024FA0D90EFB714263489011C36F9A from approximately August 1,
2020, to April 3, 2021.

24.  In this investigation, I identified four different
GUIDs used by the SUBJECT IP ADDRESS, although no one GUID was
logged in at the same overlapping time period.  As mentioned
above, a GUID can be regenerated by the user, either
intentionally or unintentionally.  For example, if a user

uninstalls a P2P software and then later reinstalls the software, the GUID will be regenerated, _i.e._, the same user will have a new GUID after the reinstallation. When there are multiple GUIDs for the same IP address, but the dates of use for the various GUIDs do not overlap, it can suggest that a user uninstalled and then reinstalled the P2P software, thus generating a new GUID each time the software was reinstalled.

25. Here, although there is more than one GUID, each GUID's dates of use do not overlap, possibly suggesting that the same user uninstalled and then reinstalled the P2P software. The earliest GUID recorded on the Network Activity Report at the SUBJECT IP ADDRESS was March 2017.

26. Based on my training and experience, I know that many individuals with a sexual interest in children will attempt to hide their activities, including uninstalling and then reinstalling applications or software that they use to conduct their criminal activities. Thus, uninstalling and reinstalling the P2P software is consistent with an individual who has a sexual interest in children and is attempting to hide their criminal activity.

27. On or about May 11, 2021, I reviewed a publicly available website that provides approximate geographical mapping of IP addresses and confirmed the SUBJECT IP ADDRESS resolved to the area of San Pedro, California.

28. On or about August 11, 2021, I accessed CPS and queried the GUID 3B024FA0D90EFB714263489011C36F9A. I learned that the GUID was active in trading suspected CSAM from the

SUBJECT IP ADDRESS as recently as on or about July 26, 2021. The names of the files being traded had names indicative of CSAM.

**B. Review of Files Possessed by the SUBJECT IP ADDRESS**

29.    Another HSI agent in my group attempted to connect directly with the SUBJECT ACCOUNT at the SUBJECT IP ADDRESS in an undercover capacity, but that agent could not establish a connection.  However, as stated above, I was able to determine which files the SUBJECT ACCOUNT possessed from reviewing the network activity report.[3]

30.    On or about June 14, 2021, from the network activity report, I compared the listed files on the report to the files contained in the CP Database, maintained by HSI in Long Beach, California.  The hash values in the CP Database are cross referenced by multiple types of hash values, including the same hashing method used by the P2P program.  I then reviewed a repository of digital exemplar files and verified that the hash values of the exemplar file matched the hash value of the network activity report.

31.    During my comparison, I found nine suspected CSAM files being offered by the SUBJECT ACCOUNT and contained in the CP Database.  The following three suspected CSAM files were 100%

---

[3] The network activity report shows the progress of files being downloaded by the SUBJECT ACCOUNT.  I selected files that had finished downloading to the SUBJECT ACCOUNT and were listed as "100%" to show the files the SUBJECT ACCOUNT possessed at that precise moment.

completely downloaded by the SUBJECT ACCOUNT and had previously been identified by law enforcement as containing CSAM:

a.    "[~ PTHC ~] 10yo Maximiliano & 17yo Cousin BJ Fuck [bibcam_gay_boy_kids_rbv_kdv_1gen].wmv" (eDonkey hash value 21BA5D56877C338D917C7F0955C38EB9) – This video appears to depict a male under 10 years old engaging in sex with an adult male. The sexual acts include sodomy, oral copulation, and stroking of the penis.  According to the Network Activity Report, this file was 100% completely downloaded by the SUBJECT ACCOUNT on or about July 30, 2020, from the SUBJECT IP ADDRESS.

b.    "3 Mexican Boys and man.avi" (eDonkey hash value 189CF45434653CCC0FE51279928FE357) – This video appears to depict three males under 13 years old engaging in sex with an adult male.  The sexual acts include sodomy, oral copulation, stroking of the penis, and sex acts between the two minors.  According to the Network Activity Report, this file was 100% completely downloaded by the SUBJECT ACCOUNT on or about March 13, 2017, from the SUBJECT IP ADDRESS.

c.    (pthc) latino - 9 yo and 16 yo mexican boys have sex.mpg (eDonkey hash value 27B780C02145FBF2500F8197CFFE55E4) – this video appears to depict a male under 13 years old and a male under 18 years old engaging in sex.  One minor male is orally copulating the other minor male.  According to the Network Activity Report, this file was 100% completely downloaded by the SUBJECT ACCOUNT on or about July 18, 2020, from the SUBJECT IP ADDRESS.

## C. Identification of the SUBJECT PREMISES

32.   On or about May 16, 2021, I reviewed a document dated May 16, 2021, from Charter Communications regarding the subscriber of the SUBJECT IP ADDRESS.  According to Charter Communications, the subscriber of the SUBJECT IP ADDRESS between on or about June 18, 2016, and May 12, 2021, was "Brian Colburt" ("COLBURT") at the SUBJECT PREMISES.  The phone number and email address were listed as (562) 822-4048 and Brian.S.Colburt@gmail.com.

33.   On or about May 19, 2021, I reviewed an Individual Report Plus Associates ("IRPA") records check for COLBURT dated May 19, 2021.  IRPA is a report generated by Thomson Reuters, a company that consolidates public records, including addresses, driver licenses, property deed transfers, and corporate information.  From my review, I learned that the most recent address listed for COLBURT was the SUBJECT PREMISES.  According to the report, COLBURT purchased the SUBJECT PREMISES in 2016.

34.   On or about May 20, 2021, I reviewed a California Department of Motor Vehicles ("DMV") records for COLBURT dated May 20, 2021.  According to DMV records, COLBURT's most recent address was listed as the SUBJECT PREMISES.  A 2016 Dodge vehicle, with personalized California license plates "CAPTACS," is registered to COLBURT at the SUBJECT PREMISES and has a Vehicle Identification Number ("VIN") of 2C3CDZFJ4GH100411.  I was able to determine the vehicle make and model is a Dodge

Challenger based on a query of the VIN with the United States Department of Transportation – National Highway Traffic Safety Administration publicly accessible website.

35.  On or about May 24, 2021, United States Postal Service advised that the only individual listed as receiving mail at the SUBJECT PREMISES is COLBURT.

36.  On or about May 24, 2021, United States Postal Service advised that the only individual listed as receiving mail at the SUBJECT PREMISES is COLBURT.

37.  On May 25, 2021, I read information provided by California Employee Development Department ("EDD") regarding COLBURT.  According to EDD, COLBURT is employed at the Palos Verdes Peninsula Unified School District ("PVPUSD").

38.  On or about June 3, 2021, I went to the complex containing the SUBJECT PREMISES and accessed the residents' directory.  I observed a listing "COLBURT 100," as follows:



39.  On or about June 18, 2021, I accessed PVPUSD's publicly accessible website and learned that COLBURT is a teacher at Palos Verdes Intermediate School.

40.  On or about July 20, 2021, I observed a Dodge Challenger with California license plates "CAPTACS," registered to COLBURT, enter the SUBJECT PREMISES' complex through a secure vehicle gate.  The vehicle pulled into a garage numbered "37." The building that contains a row of garages including garage "37," is adjacent to the SUBJECT PREMISES.

41.  On or about August 13, 2021, I went to the complex containing the SUBJECT PREMISES and accessed the residents' directory.  I observed "COLBURT 100" was still listed in the residents' directory.

VII.  **TRAINING AND EXPERIENCE ON INDIVIDUALS WITH A SEXUAL INTEREST IN CHILDREN**

42.  Based on my training and experience, and the training and experience of other law enforcement officers with whom I have had discussions, I have learned that individuals who view and possess multiple images of child pornography are often individuals who have a sexual interest in children and in images of children, and that there are certain characteristics common to such individuals:

a.  Individuals who have a sexual interest in children or images of children may receive sexual gratification,

stimulation, and satisfaction from contact with children; or
from fantasies they may have viewing children engaged in sexual
activity or in sexually suggestive poses, such as in person, in
photographs, or in other visual media, or from literature
describing such activity.  These individuals often maintain
possession of these items for long periods of time and keep
their collections in numerous places – in digital devices in
their homes, in their cars, in their workplaces, or on their
persons.

      b.   Individuals who have a sexual interest in
children or images of children also may correspond with and/or
meet others to share information and materials (including
through digital distribution via the Internet); conceal such
correspondence as they do their sexually explicit material; and
often maintain lists of names, addresses, and telephone numbers
of individuals with whom they have been in contact and who share
the same interests in child pornography.  These individuals
often maintain possession of these items for long periods of
time.

    43.   Digital child pornography on a digital device is easy
to maintain for long periods of time.  Modern digital devices
often have extremely large storage capacities.  Furthermore,
cheap and readily available storage devices, such as thumb
drives, external hard drives, and compact discs make it simple
for individuals with a sexual interest in children to download
child pornography from the Internet and save it – simply and
securely – so it can be accessed or viewed indefinitely.

44.   Furthermore, even if a person deleted any images of child pornography that may have been possessed or distributed, there is still probable cause to believe that there will be evidence of the illegal activities – that is, the possession, receipt, and/or distribution of child pornography – at the SUBJECT PREMISES.  Based on my training and experience, as well as my conversations with digital forensic experts, I know that remnants of such files can be recovered months or years after they have been deleted from a computer device.  Evidence that child pornography files were downloaded and viewed can also be recovered, even after the files themselves have been deleted, using forensic tools.  Because remnants of the possession, distribution, and viewing of child pornography is recoverable after long periods of time, searching the SUBJECT PREMISES could lead to evidence of the child exploitation offenses.

### VIII.     TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

45.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

   a. A person who connects to the Internet must use a computer or mobile device, such as a tablet or wireless telephone, to facilitate that access.  Furthermore, in my training and experience, these devices typically travel with a subject or remain in SUBJECT PREMISES.  It is therefore reasonable to believe that computers, tablets, wireless telephones, and other electronic storage media may be present in SUBJECT PREMISES.  Further, because it is possible to store certain mobile devices, such as removable storage media and wireless telephones, in a pocket, it is reasonable to believe that mobile devices may be found on the persons.

   b. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

   c. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents,

programs, applications, and materials on the device.  That

evidence is often stored in logs and other artifacts that are

not kept in places where the user stores files, and in places

where the user may be unaware of them.  For example, recoverable

data can include evidence of deleted or edited files; recently

used tasks and processes; online nicknames and passwords in the

form of configuration data stored by browser, e-mail, and chat

programs; attachment of other devices; times the device was in

use; and file creation dates and sequence.

      d.   The absence of data on a digital device may be

evidence of how the device was used, what it was used for, and

who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the

device was being controlled remotely by such software.

      e.   Digital device users can also attempt to conceal

data by using encryption, steganography, or by using misleading

filenames and extensions.  Digital devices may also contain

"booby traps" that destroy or alter data if certain procedures

are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for

devices or data that cannot currently be decrypted.

      f.   Based on my training, experience, and information

from those involved in the forensic examination of digital

devices, I know that it is not always possible to search devices

for data during a search of the premises for a number of

reasons, including the following:

g.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

h.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

46.  The search warrant requests authorization to use the biometric unlock features of the devices seized, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a

device enabled with a facial, retina, or iris recognition
function, the user holds the device in front of the user's face
with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock
function will not unlock a device even if enabled, such as when
a device has been restarted or inactive, has not been unlocked
for a certain period of time (often 48 hours or less), or after
a certain number of unsuccessful unlock attempts.  Thus, the
opportunity to use a biometric unlock function even on an
enabled device may exist for only a short time.  I do not know
the passcodes of the devices likely to be found in the search.

c.   As noted above, I know that most homes with
Internet capability use only one IP address.  That IP address,
in turn, is often shared by many devices that access the
Internet using a wireless modem.  Accordingly, if there are
multiple digital devices discovered during a search of the
SUBJECT PREMISES, any of those devices could have been used to
access the Internet and download the files discussed above.

d.   Thus, the warrant I am applying for would permit
law enforcement personnel to, with respect to any device that
appears to have a biometric sensor and falls within the scope of
the warrant: (1) depress COLBURT's thumb and/or fingers on the
device(s); and (2) hold the device(s) in front of COLBURT's face
with his or her eyes open to activate the facial-, iris-, and/or
retina-recognition feature.

47. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## IX.  REQUEST FOR SEALING

48.  It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application and search warrant affidavit.  I believe that sealing is necessary because the items and information to be seized is relevant to an ongoing investigation into criminal conduct involving minor victims and as far as I am aware, the targets of this investigation remain unaware that they are being investigated.  Disclosure of the search warrant affidavit at this time would seriously jeopardize the investigation, as such disclosure may provide an opportunity to destroy evidence, change patterns of behavior, or allow flight from prosecution. Further, based upon my training and experience, I have learned that online criminals often search for criminal affidavits and search warrants via the Internet, and disseminate them to other online criminals as they deem appropriate, i.e., post them publicly online through forums.  Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on this continuing investigation and may severely jeopardize its effectiveness.

## X. CONCLUSION

49.  For all the reasons described above, there is probable cause to believe that evidence, fruits, and instrumentalities of

violations 18 U.S.C. § 2252A(a)(2)(A) and (b)(1) (receipt or distribution of child pornography); and 18 U.S.C. § 2252A(a)(5)(B) and (b)(2) (possession of and access with intent to view child pornography), as described in Attachment B, will be found in a search of the SUBJECT PREMISES.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this __20__ day of
__August__ , 2021.

_____ PVC
UNITED STATES MAGISTRATE JUDGE

# Magistrate Judge Case Initiating Documents

[2:21-mj-03910 USA v. Warrant](#)

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## Notice of Electronic Filing

The following transaction was entered by Norell, Chelsea on 8/20/2021 at 9:20 AM PDT and filed on 8/20/2021

**Case Name:**       USA v. Warrant
**Case Number:**   [2:21-mj-03910](#)
**Filer:**              USA
**Document Number:** [1](#)

**Docket Text:**
**APPLICATION for Search Warrant filed by Plaintiff USA. (Not for Public View pursuant to the E-Government Act of 2002) (Attachments: # (1) Proposed Warrant) (Attorney Chelsea Norell added to party USA(pty:pla)) (Norell, Chelsea)**


**2:21-mj-03910-1 Notice has been electronically mailed to:**


**2:21-mj-03910-1 Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**N:\Norell Chelsea\8.20.21\A-3\A-3. pplication For SW (2016 Dodge Challenger).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/20/2021] [FileNumber=32484968-0
] [0c1e5156c6e47f84ff3e342a93b45c01d5fce5b774a5eec4e50848a49ec201f96c8
dc5754a60a7b96b6f6fbc7c946d153eb3fed1523708452995583472ab129c]]
**Document description:**Proposed Warrant
**Original filename:**N:\Norell Chelsea\8.20.21\A-3\A-3 Search Warrant (2016 Dodge Challenger).pdf
**Electronic document Stamp:**
[STAMP cacdStamp_ID=1020290914 [Date=8/20/2021] [FileNumber=32484968-1
] [9fa0de4e329b83196d8282327f56571cd270c6d6f28e099bfb8e64a3e7b8ea4d294
a105eb26810a4b2123c4af0a72d67d027fac629d6fa7359b5d049c028f788]]